CHARLES H. COOPER, Claimant, *v.* STATE OF NEW YORK.
No. 15150.

(State of New York, Court of Claims, April, 1918.)

Damages — when state not liable for — lands overflowed by flood —
negligence.

> Where upon the hearing of a claim for damages to a part of claimant's farm, bounded on the north by the Mohawk river, it appeared that although the land, to some extent, was overflowed by a flood from the Barge canal at about six A. M. on June 11, 1917, due to the negligence of the state, yet the proof shows that later on the same day and for many hours thereafter the land was flooded to a far greater and more destructive depth and extent by the natural overflow of the Mohawk

State of New York, Court of Claims, April, 1918.   [Vol. 103.

river, and that the flooding of claimant's land would have occurred to the same extent, irrespective of the break in the canal bank, the state is not liable for any part of the damage and the claim will be dismissed.

CLAIM for damages caused by the overflow of the waters of the Barge canal and the Mohawk river in the town of Frankfort, Herkimer county.

E. La Grange Smith (Edmund J. Wagner, of counsel), for claimant.

Harry W. Ehle, deputy attorney-general, for state.

CUNNINGHAM, J.   The claimant during the year 1917 was the owner of a farm in the town of Frankfort, Herkimer county. The Mohawk river bounds a thirty-acre parcel of the farm on the north. The New York Central Railroad embankment and tracks extend generally parallel with this thirty-acre parcel and the Mohawk river, and lie to the north of the latter. Northerly of the New York Central tracks is an extensive, level, swampy area, and northerly of said area, and running generally parallel with the railway tracks, is the Barge canal. Two culverts pierce the railway embankment, one circular, five feet by seven feet, and the other an arch, nine feet by twelve feet. The former is opposite that part of the Mohawk river, and the adjacent premises of the claimant, which are nearest to the tracks, the river at this point being about 450 feet from the railway embankment. The embankment is about 600 feet from the canal. The larger culvert is about 700 feet from the circular culvert, and about 450 feet from the river. The territory between the canal and the railway embankment was approximately seven feet lower than the normal water level maintained in the canal, prior to June 11, 1917, and two feet lower than the elevation of claimant's thirty-acre parcel. On that

day there was growing on the thirty-acre parcel about nineteen acres of hay, practically all of which was on that portion nearest to the tracks and to the circular culvert. Certain other crops were in process of growth on other portions of the thirty acres.

The southerly bank of the canal, northerly of and across the river and the railway tracks from the claimant's premises, still was under construction on June 11, 1917. The water in this portion of the canal, which was a part of a level nine miles long, had been maintained, prior thereto, at an elevation of 401. This was the minimum elevation permitting navigation, which it was the desire of the state officials to maintain, and which was being maintained, at this time. This elevation was maintained, under normal conditions, by the operation of the valves in the lock, at the lower end of the Nine Mile level. The maximum elevation of water, for which the canal at this point was designed, was 406, and there was a spillway in this level set, presumably, at the maximum elevation of 406, and was so designed that any water discharged into this level would be discharged over the spillway, after the water had reached an elevation of 406, unless it was fed to the lower level of the canal through the lock valves. Various natural streams of water flowing from the north were diverted into this level, and added their waters to those of the canal. The banks of the canal were designed, when completed, to reach an elevation of at least 406, and to confine safely water at that elevation. But, on June 11, 1917, this part of the southerly bank had not been completed to the planned elevation. The necessary amount of earth and wash-wall to complete and protect it, as planned, had not been placed. As a result, the upper part of the embankment, because of its incompleteness, was weak. There had been a "wet season," and on the tenth and elev-

enth there was particularly excessive precipitation. The United States Government weather observer at Utica testified that, at that place, the rainfall from eight A. M. on June tenth, to eight A. M. on June eleventh, was two and ninety-five one-hundredths inches, and during the period thereafter to eight A. M., of June twelfth, forty-two one-hundredths of an inch. The storm began at eleven A. M. on the tenth, and ended at four P. M. on the eleventh, measurements being taken by the observer at eight A. M. each day. This rainfall was the heaviest ever recorded by the United States observer at this point. The claimant's farm is about six miles east of Utica. The rainfall was general in the vicinity. Streams overflowed their banks. Roads were flooded. Several bridges on streams within four miles of the claimant's farm were carried away. At Oriskany on the Oriskany creek, a stream tributary to the Mohawk at a point westerly and above the claimant's premises, and about twenty-five miles distant from the latter, a flood, disastrous to life and property, occurred. At about six o'clock A. M. of June eleventh, the water in the Nine Mile level, augmented by the influx of the streams, swollen by the excessive rain and discharging into it, had risen so rapidly, that the lock valves were unable to carry off the excess, and to hold the level at 401. On the contrary, at that hour, the water had reached an elevation of 406, subjecting the uncompleted southerly bank to a strain beyond its power of resistance. Two hundred and twenty feet of the embankment thereupon broke, to a depth of seven feet, precipitating the water of the canal rapidly upon and over the territory between the canal and the railway embankment, and through the culverts into the already full channel of the Mohawk, and across the latter, covering the thirty acres of the claimant to a depth of approximately one and four-tenths feet. At

that hour, the Mohawk, although full, had not over-flowed yet, to any great extent if at all. The flood waters from the west and south had not yet had their effect at this point. The river was rising constantly and rapidly, and at about eight A. M., had overflowed adjacent lands, and continued to overflow rapidly during June eleventh, until later that day the thirty-acre parcel was inundated in excess of four feet, and was submerged to a depth of several feet, during the two days following. Meantime the elevation of the water in the canal receded, until no water was flowing through the breaks therefrom, and, at the same time, and thereafter, the water of the river increased in ele-vation until it was on the same level with the water in the canal. After water had ceased to flow from the canal, and the elevation of the latter had decreased approximately six feet, the elevation of the water, owing to the flooded condition of the river, steadily increased and remained at its greatest depth on the claimant's premises. The water gradually receded from claimant's premises after having covered same during a period of about three days. As a result of the overflow, the hay and other crops on the claimant's thirty-acre parcel were injured or destroyed.

This claim presents two questions for our considera-tion:

1. Was the state guilty of negligence resulting in the overflow of the claimant's premises?

2. Is the state liable for the damage which accrued to claimant as a result of the overflow of his premises, or for any part of such damage?

We are in agreement with the contention so earnestly advanced by the state, that the claimant cannot recover, unless he has established negligence on the part of the state. *Harris & Briggs* v. *State,* 12 Ct. of Claims, 22; *Gordon* v. *Ellenville & K. R. R. Co.,* 119

App. Div. 797; *Stone* v. *State,* 138 N. Y. 124; *Conklin* v. *New York, O. & W. R. Co.,* 102 id. 107; *Warner* v. *State,* 132 App. Div. 611.

The negligence of the state has been established. In its anxiety to utilize the Barge canal for navigation immediately the state allowed the Nine Mile level to fill to an elevation of 401, and diverted into that level various natural streams, flowing from the north. The state knew, or in the exercise of due care ought to have known, the volume of discharge of these streams, under conditions such as existed at and prior to the break. It knew .the capacity of the lock valves, and that they were inadequate to carry off the water discharged into the Nine Mile level, under such circumstances, without the aid of the spillway in that level. That was the very purpose of the existence of the spillway in that level — to take care of the excess of water not discharged through the lock valves. The state, in the exercise of due care, ought to have known, and undoubtedly did know, that under these circumstances the water would rise to its maximum level of 406, which it must reach, before the spillway would have any effect in assisting in the discharge of the excess water, and that in reaching that elevation the water would come into contact with, and impose a strain on, the uncompleted and unprotected southerly bank. Undoubtedly, the state took the risk of this situation in order to gain the advantage of immediate navigation of the canal, but it was negligence on its part to do so. The state contends that the precipitation was so unusual as to be an act of God which it was not obliged to anticipate. We are not impressed by that argument. The rainfall was unusual, but it was not so excessive that it ought not to have been anticipated. It best may be described as an extraordinary rainfall, but one that ought to have been anticipated to occur

Misc.]    State of New York, Court of Claims, April, 1918.

occasionally. *Fort Miller Pulp & Paper Co.* v. *State of New York,* 13 St. Dept. Rep. 8, and cases cited therein. It was negligence for the state to divert the streams, therefore, into the canal under the circumstances until the bank was so completed and protected as to be reasonably secure.    We have found that the claimant's lands were flooded at about six A. M., June 11, 1917, to a certain extent, through the negligence of the state. But, nevertheless, it is our conclusion that the state is not liable to the claimant for any of the damage which accrued to him during the time that his lands were submerged.    Although his land was overflowed to some extent by the flood from the canal, the proof convinces us that it was flooded later in the day on June eleventh, and for many hours thereafter, to a far greater and more destructive depth and extent by the natural over-flow of the Mohawk, and that this overflow of claimant's land would have occurred to the same extent, irrespective of the break in the canal bank.    Without going into detail, the testimony of various lay witnesses, as well as the computations of expert engineers, brings us indubitably to this conclusion.    The claimant's counsel in his brief concedes, in effect, the correctness of this conclusion.    He writes:  " *Undoubtedly, there would have been high water on claimant's land in any event,* but certain facts stand out distinct. At the hour when the embankment gave way there was no water on the land.    The damage was done before the water from Oriskany and the southern hills arrived."

The fact that the break and lesser flood from the canal occurred a few hours previous, in point of time, is immaterial.    There was but one continuous deluge. It began with the lesser onset of the canal waters, and was continued by the natural rise in the Mohawk.    It began at six A. M., June 11, 1917, and continued with-

State of New York, Court of Claims, April, 1918. [Vol. 103.

out interruption several days. The damage to the claimant's premises was the result of this continued flood. This is not a case where the flood from the canal caused part of the damage, and that from the river part, and where, except for the negligence of the state and the overflow from the canal, the claimant would not have suffered all the damage which he did suffer. In that case the law would require the court to apportion the damage, to the best of its ability, and make an award against the state for such proportion of the claimant's loss as in its opinion the state's negligence had caused. *Carhart* v. *State,* 115 App. Div. 1.

This is a case where a flood, due to the negligence of the state, coincided with a much greater and more destructive flood due to natural causes, and the latter was of such extent and character that the natural deluge alone would have caused inevitably all of the loss and damage which has come to the claimant. Under such circumstances, there can be no recovery against the state.

An analysis of the decisions in our appellate courts indicates the following general guide to this court in fixing responsibility and assessing damage in cases of loss by flood, where negligence of the state coincides with flood conditions due to natural causes:

(1) If none of the claimant's damage would have occurred, except for the negligence of the state, the state is liable for it all;

(2) If all of the claimant's damage would have happened irrespective of the state's negligence, the state is not liable for any of it, although its negligence may have contributed thereto; and

(3) If any part of the claimant's damages would have resulted, irrespective of the state's negligence, for such part of the damage the state is not liable; but

the state is liable only for the difference between the total amount of the claimant's damage, and that part of it which would have resulted, irrespective of the state's negligence.    In the latter case, great difficulty in apportioning responsibility in any given case probably will be met, but that difficulty is not a bar to recovery.    It is the duty of the court to apportion it, as best it can from the proof, and much license will be accorded the trial court in its effort.    *Carhart* v. *State, supra,* and cases cited therein; *O'Donnell* v. *City of Syracuse,* 184 N. Y. 1.

We find the claim at bar to come within the classification two above, and that there should be judgment for the state, dismissing the claim.

ACKERSON, P. J., and PARIS, J., concur.

Claim dismissed.