ELMER E. HARTER, Claimant, *v.* STATE OF NEW YORK, Defendant.

(Court of Claims, January, 1919.)

Damages — state not liable for, by reason of excessive rainfall— flooding of lands — evidence — burden of proof.

A canal feeder leads from a point on Limestone creek in the town of Manlius, Onondaga county, just above the Gaynor dam, to the Erie canal near an aqueduct. The creek flows from the dam parallel with the feeder and a few feet distant from and below it to the canal, under the aqueduct, and passes through the twenty-two acre farm of claimant about a mile from the aqueduct, and at claimant's premises is about forty feet wide. On the early morning of July 2, 1915, as the result of a four days' excessive rainfall, the creek rose rapidly, overflowed its banks and continued to rise until claimant's premises were flooded to a depth of between six inches and two and one-half feet. The water began to recede on the afternoon of July third and the premises were free from it on the next day. Upon the hearing of a claim to recover for the destruction of claimant's crops and pasture resulting from the inundation on the ground

that the flood was caused in whole or in part by the discharge of water into the creek from the canal and feeder through a waste weir and over the sides of the aqueduct, the claimant failed to establish, by a preponderance of evidence, that any material quantity of water reached the creek from either the canal or the feeder. *Held,* that the burden was upon plaintiff to produce evidence tending to show that the state was responsible for any portion of the damages and his failure not only to produce any proof of the extent of the state's liability but also that it was responsible for any part of the loss, calls for the dismissal of the claim.

*Cooper* v. *State,* 103 Misc. Rep. 209, followed.

CLAIM for damages caused by the flooding of claimant's land.

Costello, Burden, Cooney & Walters (Oliver D. Burden and R. Wormouth, of counsel), for claimant.

John H. Clogston, deputy attorney-general, for state of New York.

CUNNINGHAM, J.   In connection with its canal system the state maintains a dam, known as the Gaynor dam, across Limestone creek, in the town of Manlius, Onondaga county.   A canal feeder leads from a point on the creek just above the dam to the Erie canal, at a point near an aqueduct.   Limestone creek flows from the dam parallel with the feeder, and a few feet distant from and below the latter, to the canal and under the aqueduct.   About one-fourth of a mile along the feeder from the intake, and about half a mile up the feeder from the aqueduct, is a waste weir in the feeder bank nearest to the creek.   The creek, after it flows under the canal at the aqueduct, passes through the premises of the claimant, about a mile from the aqueduct.   Claimant's property consists of about twenty-two acres, used for farming purposes.   At the intake to the feeder is a bulkhead equipped with stop-planks, so arranged that when in place, as they were at the time

in question, they shut off substantially all water from the creek. The weir is equipped with four vertical gates, their square iron stems extending to the top of the weir, and a few inches above the surface of the ground. The gates are operated by turning these stems with a large wrench. Water discharged from the feeder through the weir flows directly into the creek a few feet below. The elevation of the top timber of the aqueduct is 429.33, and that of the top of the flashboard hereinafter mentioned at the weir, when in position, is 429.35. The creek at the claimant's premises is about forty feet wide. On the early morning of July 2, 1915, the creek rose rapidly, overflowed its banks, and continued to rise until twenty and one-half acres of the claimant's premises were flooded to a depth of between six inches and two and one-half feet. The water began to recede on the afternoon of July third, and the claimant's property was free from it on July fourth. As a result of the inundation, the claimant's crops and pasture were destroyed, and he otherwise was damaged in the total sum of $195. This claim is to recover for the damage, on the ground that the flood was caused in whole or in part by the discharge of water into the creek from the canal and feeder through the weir and over the sides of the aqueduct. The flood was preceded by a period of excessive rainfall, amounting from June thirtieth to and including July third, to about four and sixteen one-hundredths inches, in that vicinity.

There is a sharp conflict in much of the testimony in this case. Henry A. Carhart, Theodore Walrath, and the former's son, Norbert H. Carhart, testified in substance: That on the morning of July third, they went together to the aqueduct and thence along the bank of the feeder to the waste weir, and the intake of the feeder and the Gaynor dam. That the flats

between the claimant's farm and the aqueduct were covered with water and the creek, from the aqueduct to a point opposite the waste weir, was out of its banks, and from the waste weir to the dam was within its banks; that about three inches of water was running over the spillway of the aqueduct on the south side, and on the north side a little more than that. At the waste weir the two center gates of the four in the weir were partly open and the flashboard at the top of the spillway of the weir was raised at one end. Water from the feeder was flowing through these apertures in large volume into the creek. That the flashboard at the weir was fastened by a spike at one end and was raised up and suspended by a chain from the wood-work above it to a spike in the raised end of the board, and about eleven inches of water was passing through and over it.

Charles A. Goodfellow testified in behalf of the claimant. He said that on the morning of July second he discovered that his rowboat was missing and went along the canal near the aqueduct in search of it. Not finding it, he continued up along the bank of the feeder and found it caught at the top of the waste weir, and under the bridge over the latter. He testified that the center gates were open, one being partly closed with a stick caught in it, preventing it being closed tightly. He said nothing about the flashboard being raised, and upon being interrogated expressly regarding it testified as follows: " Q. Do you remember anything about the flashboard or didn't you notice it? A. Don't remember anything about flashboard, I seen there was one on there."

Goodfellow had an excellent opportunity to note the position of the flashboard, because he went down the feeder bank below the weir to detach his boat. Thus he could observe the board and if water was

escaping at that point.  He confessed to a very lively interest in the matter.  He kept a memorandum book in which from time to time he made entries of dates when the weir gates were open, and particularly, an entry that the gates were open on July 2, 1915, the purpose of the entries being to form the basis of a claim or claims to be made by himself or mother against the state.

Albert H. Eastman, the feeder tender, testified for the state, that it was his duty to watch the feeder generally and to attend to the gates when necessary.  Just before navigation opened in 1915, noticing that the flashboard at the weir was gone, he reported that fact, and the state's carpenter put in a new one, and spiked it in place, driving the spikes in fully.  He had not opened the gates, nor did he close them on either July second or third, but on the latter date he went to the waste weir and found the gates were tightly closed, and the flashboard in place, as it had been left by the carpenter.  The flashboard and spikes were in the same condition within a few days before he testified.

Squier, the carpenter, testified that he put in a new flashboard in May, 1915, and described the dimensions of the board and the particular manner in which he fitted and placed it.  He put a brace on top of it and fastened the brace to the under side of the bridge over the weir.  The board could not be raised without removing this brace.  The following spring he examined it again and found the flashboard and brace to be in the same position and condition as when he did the work.  They were still in the same position and condition two days before he testified.

Glenn Edwards, the canal bank watch, who made records daily of the height of the water in the canal at the aqueduct or elsewhere in the same canal level, testified that the average normal height of the water

at the aqueduct was seven feet six inches, and that his measurements on July 2 and 4, 1915, show the water height at that point was seven feet six inches, and on July first and on July third, it was seven feet seven inches.

Marshal B. Palmer, a civil engineer, testified for the claimant, and it was conceded by both parties that the capacity of the creek at the claimant's premises, banks full, is 480 cubic feet per second. Mr. Palmer, from gauge readings furnished to him, made the necessary computations and testified that on July 1, 1915, 355 cubic feet of water per second passed over the Gaynor dam. On July 2, 1915, at two o'clock, 303 cubic feet per second passed over it. At eight o'clock, P. M., July second, 930 cubic feet per second flowed over it. At seven A. M., on July third, 588 cubic feet per second was the flow. The accuracy of the gauge readings was in some dispute, but the maximum flow on any hypothesis, on the evening of July second, was at least 620 cubic feet per second.

The principal questions involved in this inquiry are:

1. Did any water from the canal system pass into the creek by way of the aqueduct or waste weir?

2. Has the claimant established that any water passed through the waste weir because of the fault or negligence of the state?

3. If water was discharged through the weir or at the aqueduct into the creek, is the state liable under the circumstances of this case, for any part of the claimant's loss?

We find that the claimant has failed to establish by a preponderance of the evidence, that any material quantity of water reached the creek from either the canal or feeder. The testimony of Edwards to the height of the water at the aqueduct is determinative of that phase of the matter, and the positive and con-

vincing statements of Eastman and Squier, to the placing of the flashboard and brace, and their apparent continuance in the same position and condition down to the time of trial, are insurmountable. Coupled with the discrepancy between the conditions described by the claimant's three witnesses as of July third, and his witness Goodfellow as of July second, they lead us to conclude that the claimant has failed to sustain his burden of proof. The witness Goodfellow palpably was confused about the dates involved. It is quite possible that the claimant's other witnesses were testifying relative to another occasion.

Assuming that the gates and board were open, the claimant has not established fault or negligence on the part of the state, unless it is to be found that the state's witnesses, particularly Eastman, testified at variance from the facts, and it is to be inferred that some state employee was thus being protected. Such a conclusion is not justified, and the claimant presented his case on the theory that the negligence of the state consisted in maintaining gate stems of the simple design and in the exposed situation of those at the weir, thus permitting their manipulation by unauthorized persons, and because Eastman failed to discover opportunely, or at all, that they were open. The case is barren of any proof of the identity of the individual who opened them, or the manner in which it was done. Having refused to infer that Eastman opened the gates and flashboard, the question remains if the state is responsible for their manipulation by an unauthorized agency. No evidence was afforded that it is necessary or usual to equip gates at waste weirs, or in similar situations, differently from these. There was testimony that in water supply systems, and at dams, and barge canal locks, devices are in use to prevent unauthorized interference. These consist of houses

built over the gate mechanism, or irregular shaped
stems, requiring a wrench of special design, or the
securing of the stems by Yale locks. However proper
and usual in such situations, they have not been shown
reasonably necessary for the waste weir of a canal
feeder. These stems are not readily operable. They
require a large wrench, and Eastman kept his in the
care of a relative living near the weir. This was suffi-
cient protection against ordinary vandalism and small
boys. Due care did not require the state to anticipate
any other interference with the gates. What motive
was to have been anticipated for such interference,
and who could have the motive? This was not an
important hydraulic mechanism, and no one could
profit by interfering with it. The likelihood and con-
sequences of interference were not such as to require
the state to take special precautions. Furthermore,
any one interested to the extent of bringing to the scene
and applying a large wrench necessarily would have
found little difficulty in entering a house or shanty
erected over the stems, or in applying a Stillson wrench
to a specially shaped or designed gate stem, or destroy-
ing a lock and operating the gates. The use of Yale locks
and the necessity for having the appropriate key might
result in delay in operation at times when the neces-
sity was immediate. But, in any event, the main fact
is that reasonable care and precaution did not require
the state to anticipate that any one would interfere
with the gates. Due care to guard against overflow
of the feeder and danger to the banks might have
required more efficient patrol than Eastman gave but
we are not interested in that phase of the matter.
Negligence is imputed to him by the claimant, in not
visiting the weir to observe the condition of the gates,
— a different proposition. There was no negligence
in that respect. He testified to the condition in which

he left the weir, and that the gates were closed and the flashboard in place. He had no reason to anticipate that they had been interfered with, or to visit and inspect the weir with great frequency to see if they had. He testified that his son visited there daily and that he personally went to the gates on July third. His omission to be there July second was not negligence for which the state is liable.

But assuming the state negligently discharged water into the creek at the aqueduct and weir in the volume alleged by the claimant, the latter has failed to establish his right to an award. The maximum amount of water discharged at any time into the creek according to the claimant's contention and as computed by the engineer, Palmer, was 124 cubic feet per second. He contends that this volume, added to the natural discharge of the stream, caused it to overflow and flood his land a few hours, in point of time, before the natural discharge alone would have caused the flood, and that his lands were flooded by act of the state and the damage done shortly before it would have been done through natural causes, and, therefore, that the state is liable for his loss; or in the alternative, that the state is liable for such a proportion of his damage as the discharge from the canal system relates to the sum of it and the natural flow of the creek. We cannot accede to this proposition.

The leading case on this subject is *Carhart* v. *State of New York,* 115 App. Div. 1. The court said there: " These authorities establish the proposition that if this injury would have happened irrespective of defendant's negligence the defendant is not liable for any damage, although its negligence contributed thereto. It would seem to follow, as a necessary corollary to this proposition, that if any part of these damages would have resulted, irrespective of defend-

ant's negligence, for such part of the damage the defendant is not liable. The problem is then presented to determine what part, if any, of the damage would have resulted irrespective of the defendant's negligence."

This principle was affirmed in *Ostrander* v. *State of New York,* 192 N. Y. 415. We applied it in a case identical in principle with the one at bar very recently. In *Cooper* v. *State of New York,* 103 Misc. Rep. 209, the claimant's premises were inundated by a break and flood from the canal, followed a few hours later by a much larger natural freshet from the Mohawk river. We refused an award to the claimant and wrote: "The fact that the break and lesser flood from the canal occurred a few hours previous, in point of time, is immaterial. There was but one continuous deluge. It began with the lesser onset of the canal waters, and was continued by the natural rise in the Mohawk. * * * This is a case where a flood, due to the negligence of the state, coincided with a much greater and more destructive flood due to natural causes, and the latter was of such extent and character that the natural deluge alone would have caused inevitably all of the loss and damage which has come to the claimant. Under such circumstances, there can be no recovery against the state."

Also, "If any part of the claimant's damages would have resulted, irrespective of the state's negligence, for such part of the damage the state is not liable; but the state is liable only for the difference between the total amount of the claimant's damage, and that part of it which would have resulted, irrespective of the state's negligence."

On July second, the natural discharge of the creek reached a maximum of 930 cubic feet per second. The capacity of the stream was only 480 cubic feet per

second. At some time during July second, the flood would have occurred naturally. As a result, probably all of the claimant's damages would have been inflicted, irrespective of any discharge from the canal system, and under the principle above mentioned there can be no recovery for it. Certainly if not all, a part of the damages would have resulted, regardless of any discharge from the canal or feeder, in which event the state would be liable for that part only which would not have occurred naturally. If the state was responsible for any portion of the damage, the claimant failed to offer any evidence to establish that fact or that portion. The burden is upon him to prove all the essential elements of his case. He not only has failed to afford any proof of the extent of the state's liability, but also, that the state is liable for any part of the loss at all.

We have discussed this case at some length, because of its importance to others similarly situated.

.It is clear to us that the claim must be dismissed.

ACKERSON, P. J., concurs.

Claim dismissed.