THE MONTEZUMA GARDEN CO., INC., Claimant, *v.* THE STATE OF NEW YORK.

### Claim No. 14138.

Court of Claims, October, 1923.

*Claims against state — claim for destruction of growing crops by reason of opening of lock in Barge canal — claimant entitled to judgment for reasonable worth of crops.*

CLAIM for damage to growing crops.

*Edson W. Hamn,* for claimant.

*Carl Sherman,* attorney-general (*John H. Clogston,* deputy attorney-general, of counsel), for State of New York.

MORSCHAUSER, J. The claimant presented a claim against the state alleging that certain crops which it had growing upon its premises were in September, 1915, damaged and destroyed as a result of the overflow and leakage of water from the Erie canal and new Barge canal by reason of the negligent operation of its canal on the part of the state in the construction and maintenance of said Erie and Barge canals, and in the operation of lock No. 52 of said Erie canal just west of the village of Port Byron, Cayuga county, resulting in the overflowing of its banks and causing said waters to be thrown over and upon the adjoining and adjacent lands and over and into Crane creek, or Salt creek, thereby greatly increasing the volume of water and raising its level so that it overflowed its banks, and caused said overflow of the waters of said Crane creek and Salt creek to back up and be thrown over and upon the premises of this claimant; and that by and in the construction and operation and use of the gates of the Mud Lock dam at Montezuma, N. Y., before the new Barge canal was completed below the said dam, and in allowing obstructions to remain in the bed or channel of said new Barge canal or Seneca river at the mouth of said Crane creek, and north thereof, in said town of Montezuma, thereby preventing the flow of and carrying away of the waters from said Crane creek and the said overflow waters

from and through the gates of said Mud Lock dam, and by the negligent use and operation of opening the gates of the aqueduct of the Erie canal over the Seneca river at Montezuma, Cayuga county, thereby emptying and throwing the waters from the Erie canal down and over into said Seneca river, and greatly increasing the volume of water of said river, and raising the water level of the same so that it overflowed its banks and caused said overflow waters to be thrown upon the premises of this claimant, and also backed up the waters of the Crane creek resulting in overflowing its banks at or near its mouth in the said Seneca river, and causing the said overflow waters to be thrown over and upon the lands and premises of the claimant, and thereby killing and destroying claimant's crops of celery, lettuce, carrots and cabbage.

Upon the trial the parties entered into a stipulation as to the facts as follows:

1. That on the early morning of September 13, 1915, a large quantity of water had gathered in the Weedsport level of the Erie canal. It was filled and the New York Central tracks were being flooded and the water was running over the towing path on this Weedsport level. This was the level east of the Montezuma level, the first level east of the Montezuma level and just east of lock 52.

2. That the canal authorities opened the seven gates of lock 52 at the west end of the Weedsport level just west of Port Byron and ran the waters from the Weedsport level over into the Port Byron-Montezuma level.

3. That after the opening of the seven gates in lock 52 the water in the Montezuma level began to rise and rose until the Erie canal overflowed its banks west of lock 52 on both the north and south sides of same.

4. That the Erie canal west of lock 52 and just east of Hotailing road overflowed its north bank from about nine-thirty A. M. until the evening of September 13, 1915.

5. The state by opening the seven paddles of lock 52 on the morning of September thirteenth discharged from the Weedsport level into the Port Byron-Montezuma level of the canal a large quantity of excess waters.

6. The state did not open the gates of the Richmond aqueduct until between twelve and one o'clock in the afternoon of September 13, 1915, and that said gates remained open until some time in the forenoon of September 14, 1915, when they were closed.

7. The inflow of excess waters from the Weedsport level through lock 52 into the Port Byron-Montezuma level was as appears by the evidence 911 cubic feet per second and 120 cubic feet per second from other sources, making a total of 1,030 cubic feet per second.

8. The outflow of excess waters from the Port Byron-Montezuma level was as appeared by the evidence 1,457 cubic feet per second after the gates of the Richmond aqueduct were opened.

9. That the state by failing to open the gates of the Richmond aqueduct in the morning of September thirteenth when the seven paddle gates of lock 52 were opened impounded a large quantity of excess water in the Port Byron-Montezuma level.

10. That by impounding this excess water from the Weedsport level in the Port Byron level the waters of same with other waters were raised so that they overflowed its banks.

11. That Crane brook was in flood and the elevation of the water surface was within one foot of the aqueduct at Crane brook on the south or upper side.

12. That on the night of the 12th day of September, 1915, the localities heretofore referred to were visited by a severe and unusual downfall of rain.

13. That the outflow of these excess waters over the spillway of Richmond aqueduct into the Seneca river was 487 cubic feet per second and the outflow of said excess waters through the seven gates of the Richmond aqueduct into the Seneca river was 570 cubic feet per second.

14. That Mr. Wesley, chief clerk of Superintendent Hallock, in the morning of the 13th day of September, 1915, and at about the time the seven paddle gates were opened in lock 52, called Mr. Dobson, the superintendent of the Cayuga and Seneca canal, and asked him to give them relief there by opening the paddles in lock No. 9 (that is, Mud lock) and emptied this water into the Seneca river.

It appears from the evidence that on the night of the 12th of September, 1915, there was an unusual storm and downpour of rain, and that in the Montezuma level of the Erie canal, which is west of lock No. 52 and between it and the Richmond aqueduct, the waters overflowed the banks of the canal. The Montezuma level was five miles in length, and on the morning of the 13th of September, 1915, a large volume of water came into the Weedsport level of the canal, which was the canal farther east and higher up than the Montezuma level, in such quantities that it overflowed the banks and was likely to destroy the whole structure of the Erie canal. Confronted with this unusual condition, the state opened the gates of lock 52 to relieve that condition and let the waters down into the Montezuma level of the Erie canal, and in this way allowed this excess water to flow down into the Seneca river, which is below the Richmond aqueduct, the Seneca river being the new Barge canal. At the Richmond aqueduct there were two spillways, one on either side. They were a little over 1,400 feet in length. The water ran over the spillways and down

over the Richmond aqueduct into the river. The evidence also showed that in this way large quantities of water were poured into Crane or Salt creek, which emptied into the Seneca river above the lands of the claimant. The storm commenced on the night of the twelfth of September. The gates of the canal were opened at about noon of the thirteenth of September, and the Seneca river opposite the lands of claimant commenced to rise between two and three P. M. of the same day. The rain had ceased on the morning of the thirteenth of September, and about three o'clock in the afternoon of September thirteenth the water in the Seneca river had risen to a sufficient height to overflow the dyke or embankment along the claimant's land, and filled the claimant's ditches, and flowed over the premises of claimant where its crops were growing at that time. The claimant's land was located about a mile below the place where the waters of the canal emptied into the Seneca river. The water remained on the claimant's premises for several days and, the weather turning exceedingly warm, destroyed the crops of the claimant. It also appeared from the evidence that on the fourteenth of September the water in the Seneca river began to rise to a higher extent than prevailed on the thirteenth, and rose to the extent of at least from a foot to a foot and a half higher than it was on the thirteenth. The engineer called by the claimant, Mr. Guy Moulton, gave it as his opinion as an experienced engineer that this sudden rise of the water in the river on the fourteenth of September was caused by reason of the fact that the Taintor gates at lock No. 1 were raised. He also testified that on the evening of the thirteenth of September the gauge at Free bridge showed no rise over what it was on the morning of the thirteenth of September, the day following the storm; but that the next morning, September fourteenth, the gauge at Free bridge, which was located above the aqueduct, showed there was a rise of water of one and one-tenth feet. The witness Moulton had been employed as an engineer by the state, knew the various locks and was acquainted with the conditions of the land and of the watershed of Cayuga lake, and the canal from Cayuga lake down to and below the lands of the claimant. We believe his opinion which he gave as to why there was a sudden rise of the water after the thirteenth is correct, as there was no storm or rainfall after the thirteenth to explain or account for the sudden rising of the Seneca river after the lands of the claimant were flooded, except the one that this experienced engineer gave.

Judge Cunningham, after an exhaustive research of the law, has laid down the rule in these cases, we believe, correctly; and in his opinion in *Matter of Cooper* v. *State of New York*, 103 Misc. Rep. 209, he states the rule to be as follows:

"(1) If none of the claimant's damage would have occurred, except for the negligence of the state, the state is liable for it all;

"(2) If all of the claimant's damage would have happened irrespective of the state's negligence, the state is not liable for any of it, although its negligence may have contributed thereto; and

"(3) If any part of the claimant's damages would have resulted, irrespective of the state's negligence, for such part of the damage the state is not liable; but the state is liable only for the difference between the total amount of the claimant's damage, and that part of it which would have resulted, irrespective of the state's negligence. In the latter case, great difficulty in apportioning responsibility in any given case probably will be met, but that difficulty is not a bar to recovery. It is the duty of the court to apportion it, as best it can from the proof, and much license will be accorded the trial court in its effort. *Carhart* v. *State, supra,* and cases cited therein; *O'Donnell* v. *City of Syracuse,* 184 N. Y. 1."

Applying this rule of law, if the damage would have occurred irrespective of the state's negligence on September thirteenth, the claimant cannot recover. But we are satisfied from the evidence that the action of the state in opening the gates of its canal and causing a large volume of water to flow into the Seneca river, was the reason for the rise of the water in the river, and the cause of the overflowing of the claimant's land. It appeared from the evidence that the claimant had proper ditches, and also an appliance for pumping the water out of the ditches which was sufficient to keep the water from the Seneca river from overflowing claimant's lands in the course of the usual storms. And we are further satisfied that the land of the claimant would not have been overflowed if the state had not thrown an unusually large quantity of water in the Seneca river at one time.

The evidence also convinces us that the sudden rising of the Seneca river on the fourteenth of September was not produced by natural causes, but by the opening of the Cayuga lock near Cayuga lake, which was also part of the canal system and under the control of the state, and was caused wholly by the state. We, therefore, find that the flooding of claimant's land was caused wholly by the negligence of the state, and that claimant is entitled to recover. " There shall be allowed and paid to every person sustaining damages from the canals or from their use or management, or resulting or arising from the neglect or conduct of any officer of the state having charge thereof, or resulting or arising from any accident, or other matter or thing connected with the canals," * * *. Canal Law (Laws of 1909, chap. 13), § 47.

It appears from the evidence in the case that the claimant had growing upon its land at the time of the flooding, 248,335 heads

of celery which were reasonably worth the sum of $4,470.03; that it had 2,783 crates of lettuce which were reasonably worth the sum of $1,391.70; and also had two and three-one-hundredths acres of carrots which were reasonably worth the sum of $169.04; and four acres of cabbage which were reasonably worth the sum of $100, all of which were destroyed by the overflow of the water upon claimant's lands.

Claimant is, therefore, entitled to judgment for the sum of $6,180.36.

ACKERSON, P. J., concurs.

Judgment accordingly.