THE MONTEZUMA GARDEN CO., INC., Claimant, v. THE STATE OF NEW YORK, Defendant.

(Claim No. 14138.)

Court of Claims, April 20, 1926.

State — claim for value of growing crops destroyed by flooding of lands by reason of alleged negligent operation of Erie canal — land situated at junction of Seneca river and Crane creek — evidence shows that unusual and extraordinary rain visited watershed of Seneca river — claimant not entitled to recover.

Claimant, owning reclaimed lands in the vicinity of the junction of the Seneca river and Crane creek, a tributary thereto, is not entitled to recover the value of growing crops destroyed by the flooding of said lands, since the evidence shows that the damage was caused by an unusual and extraordinary fall of water reaching over the entire watershed of the Seneca river and its tributaries. and there is no proof that the overflow on plaintiff's lands was caused by the release of water in the Erie canal.

CLAIM for value of growing crops destroyed by flooding of lands due to negligent operation of old Erie canal.

*Edson W. Hamn,* for the claimant.

*Carl Sherman,* Attorney-General [*John H. Clogston* and *Edward J. Mone,* Deputy Attorneys-General of counsel], for the defendant.

PARSONS, J. This claimant seeks to recover the sum of $6,180.36, the value of growing crops on its garden lands which were a reclaimed portion of the Montezuma swamp, which it claims were destroyed on or about September 13, 1915, by the flooding of said lands.

It claims that the flooding was caused by the negligent operation of the old Erie canal by the State and in particular by the operation of gates in lock 52 and in the Richmond aqueduct in such a manner as to suddenly discharge so large a volume of water into the Seneca river as to cause it to overflow its banks and flood this claimant's lands and cause the destruction of the growing crops. There is also a claim that such discharge of water into the Seneca river caused water to back up into Crane or Salt creek, a tributary

to the Seneca river, and to cause it to overflow onto the claimant's lands.

There is no evidence in the record or is it claimed that the State directly discharged any water into Crane or Salt creek.

The lands of the claimant were located in the town of Montezuma in sort of a triangle lying between the Seneca river and Crane or Salt creek. It is low land lying at about the same level as the normal level of the water in the Seneca river.

Upon the trial the parties entered into a stipulation as to certain facts as follows:

" 1. That on the early morning of September 13, 1915, a large quantity of water had gathered in the Weedsport level of the Erie canal. It was filled and the New York Central tracks were being flooded and the water was running over the towing path on this Weedsport level. This was the level east of the Montezuma level, the first level east of the Montezuma level and just east of Lock 52.

" 2. That the canal authorities opened the seven gates of Lock 52 at the west end of the Weedsport level just east of Port Byron and ran the waters from the Weedsport level over into the Port Byron-Montezuma level.

" 3. That after the opening of the seven gates in Lock 52 the water in the Montezuma level began to rise and rose until the Erie canal overflowed its banks west of Lock 52 on both the north and south sides of same.

" 4. That the Erie canal west of Lock 52 and just east of Hotailing road overflowed its north bank from about 9:30 A. M. until the evening of September 13, 1915.

" 5. The State by opening the seven paddles of Lock 52 on the morning of September 13th discharged from the Weedsport into Port Byron-Montezuma level of the canal a large quantity of excess waters.

" 6. The State did not open the gates of the Richmond aqueduct until between 12 and 1 o'clock in the afternoon of September 13, 1915, and that said gates remained open until sometime in the forenoon of September 14, 1915, when they were closed.

" 7. The inflow of excess waters from the Weedsport level through Lock 52 into the Port Byron-Montezuma level was as appears by the evidence 911 cubic feet per second and 120 cubic feet per second from other sources, making a total of 1030 cubic feet per second.

" 8. The outflow of excess waters from the Port Byron-Montezuma level was as appeared by the evidence 1457 cubic feet per second after the gates of the Richmond aqueduct were opened.

" 9. That the State by failing to open the gates of the Richmond

9

aqueduct in the morning of September 13th when the seven paddle gates of Lock 52 were opened impounded a large quantity of excess water in the Port Byron-Montezuma level.

" 10. That by impounding this excess water from the Weedsport level in the Port Byron level the waters of same with other waters were raised so that they overflowed its banks.

" 11. That Crane brook was in flood and the elevation of the water surface was within one foot of the aqueduct at Crane brook on the south or upper side.

" 12. That on the night of the 12th day of September, 1915, the localities heretofore referred to were visited by a severe and unusual downfall of rain.

" 13. That the outflow of these excess waters over the spillway of Richmond aqueduct into the Seneca river was 487 cubic feet per second and the outflow of said excess waters through the seven gates of the Richmond aqueduct into the Seneca river was 570 cubic feet per second.

" 14. That Mr. Wesley, Chief Clerk of Supt. Hallock, in the morning of the 13th day of September, 1915, and at about the time the seven paddle gates were opened in Lock 52, called Mr. Dobson, the Superintendent of the Cayuga and Seneca canal, and asked him to give them relief, thereby opening the paddles in Lock No. 9 (that is Mud lock) and emptied this water into the Seneca river."

There seems to be a slight discrepancy in the amount of water discharged into the river between paragraphs 8 and 13 of the stipulation, as it appears to me, of 407 cubic feet per second. This is not very material as the case appears to me. The questions in this case are: Where did the excessive water in the Seneca canal come from; (a) was it due to the sudden, negligent and unlawful discharge from the canal by the State so that none of the damages of claimant would have occurred except for the negligence of the State; (b) was it due to natural causes so that all of the alleged damages would have occurred irrespective of the acts of the State; (c) would the damages have occurred anyway although the State may have slightly contributed thereto?

It seems to me from a careful consideration of all the evidence that the last question must be answered in the affirmative, in which event the State is not liable. (*Cooper* v. *State*, 103 Misc. 209; *Carhart* v. *State*, 115 App. Div. 1; *Harter* v. *State*, 106 Misc. 9; *Bauer* v. *State*, Id. 1; *O'Donnell* v. *City of Syracuse*, 184 N. Y. 1.)

It is conceded in the stipulation that on the night of September 12, 1915, this locality was visited by a severe and unusual downfall of rain. (See paragraph 12.)

It is further established by the proof that this rain storm extended into the morning of the thirteenth and that on the thirteenth the water in the river and in the drainage ditches on the lands of the claimant was rising so that the claimant was taking precautions to prevent the flooding of his lands by repairing his dike along the river and pumping water from the main drainage ditch; that later in the day of the thirteenth the precautions were unavailable and the water from the river began to overflow its banks and filled the drainage ditches and finally began to overflow the claimant's garden.

It is conceded that early in the morning of the thirteenth an excessive amount of water had collected in the Weedsport level of the canal east of the lands of the claimant and the State opened the gates at lock 52 and let the excessive water into the Montezuma level next westerly from the Weedsport level, but did not open the gates of the Richmond aqueduct, which carried the canal over the Seneca river, until about noon on the thirteenth. This caused the water to overflow the banks of the canal on the Montezuma level, and, after the gates of the Richmond aqueduct were opened, caused the water to overflow the spillways of the aqueduct into the Seneca river. Had the gates of the aqueduct been opened at or about the same time that they were opened in lock 52, the water in the Montezuma level would, no doubt, have passed into the Seneca river.

The contention of the claimant seems to be based on the theory that the storing of the water in the Montezuma level and then suddenly opening the gates in the aqueduct spilled the water suddenly into the Seneca river and caused the flood. The stipulations and proofs seem to establish that this method of operation spilled about 427 cubic feet per second more into the level, at the maximum discharge, than it would have had the gates at the aqueduct been opened at the same time as the gates in lock 52. This, no doubt, raised the water in the Seneca river to a certain degree. The amount of raise is estimated at somewhere between one and one-half and six inches, which would have had no great effect on the level of the river. The question then arises where the water that raised the level of the Seneca river and caused the flooding of the claimant's lands came from. The expert witness for the claimant says that he can account for it in no way except that the taintor gates at lock No. 9 must have been opened. These gates hold back the waters of the Cayuga lake from the Seneca river at what is known as lock No. 9. There is no evidence in the record that said taintor gates were open and such an assumption on the part of the witness Moulton has no basis of fact so far as the evidence in the case is concerned.

The gates at the aqueduct were closed in the forenoon of the fourteenth but the water flooding the claimant's lands continued and increased during all of the fourteenth and lasted during the · fifteenth and into the sixteenth before it began to recede. It is stipulated and the evidence shows that there was a severe and unusual rainfall on the night of the twelfth and extending into the morning of the thirteenth. It is also shown that the watershed of the Seneca river and the Clyde river, which joins the Seneca near the point in question, is something over 2,500 square miles. This whole area was visited by the same storm and it took some time for the whole drainage to reach and affect the Seneca river. This fact, it seems to me, accounts for a very large part of the high water in the Seneca river.

The hydraulic experts for the claimant and for the State seem to agree that had there been no canal and had no excess water been discharged from the canal the lands of the claimant would have been flooded anyway on the fourteenth. This case, therefore, seems to come within the second rule laid down in *Cooper* v. *State* (*supra*): " If all of the claimant's damage would have happened irrespective of the State's negligence, the State is not liable for any of it, although its negligence may have contributed thereto."

The claim should be dismissed.

ACKERSON, P. J., concurs.